UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| CARL D. EDWARDS, # 270243, ) | Civil Action No.: 4:06-0748-HFF-TER |
| ) | |
| Plaintiff, ) | |
| ) | |
| -vs- ) | **REPORT AND RECOMMENDATION** |
| ) | |
| ) | |
| PRAVIN PATEL, M.D., WILLIE ) | |
| EAGLETON, Warden-ECI, and THE ) | |
| SOUTH CAROLINA DEPARTMENT ) | |
| OF CORRECTIONS, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**I.     INTRODUCTION**

Plaintiff, Carl Edwards, is an inmate in the custody of the South Carolina Department of Corrections (SCDC) at the Evans Correctional Institution (ECI). Plaintiff, proceeding pro se, brings this civil rights action pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his constitutional rights by failing to provide him with proper medical care. On October 6, 2006, Defendants filed a Motion for Summary Judgment (Document # 17). The undersigned issued an Order, filed October 10, 2006, pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the Motion for Summary Judgment and the possible consequences if he failed to respond adequately. Plaintiff filed a Response (Document # 23) to the Motion on October 24, 2006, to which Defendants filed a Reply (Document # 24) on October 31, 2006. All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d), DSC. Because this is a dispositive motion, this report and recommendation is entered for review by the district judge.

## II.     FACTUAL HISTORY

Plaintiff sets forth the following factual allegations in his Amended Complaint:

On August 31, 2003, he sustained an injury about two inches above his right ankle when another inmate accidently ran a wheelchair up on his right leg. Amended Complaint, "Original Complaint Allegations" at ¶ 1. The injury caused his leg to start bleeding "real bad," but Plaintiff thought it would be alright and did not sign up for sick call until the next morning. Id. When Plaintiff saw the nurse on September 1, 2003, she bandaged his leg and told Plaintiff he needed to see the doctor, Defendant Pravin Patel (Dr. Patel). Id. at ¶ 2. Plaintiff first saw the doctor on September 4, 2003. Id. By that time, his leg was leaking pus "real bad." Id. Dr. Patel told Plaintiff that the wound would heal on its own. Id. Plaintiff asked Dr. Patel to give him some antibiotics to help keep his leg from getting infected, bu Dr. Patel refused to do so. Id. According to Plaintiff, "Dr. Patel knew that I was and am a diabetic and that he had not long prior to this incident had to diagnose the same leg with Cellulitis, and had medical knowledge of the danger that he was putting me and my leg in by depriving me of the medicine need to stop the infection from turning into Gangrene." Id. Plaintiff also noted that he gets "diabetic ulcers" on his leg. Id. at ¶ 3.

Plaintiff's leg continued to "swell and become more infected, to the point that it begun to get yellow all under the skin, and then another spot come up on the back of my leg and pus was oozing out of it." Id. Plaintiff returned to medical on September 9, 2003, and Dr. Patel again refused to give Plaintiff antibiotics. Plaintiff claims the infection was "now very visible to the naked eye." Id. That same day, an officer looked at Plaintiff's leg and took him back to medical for treatment. Id. at ¶ 4. Dr. Patel indicated that he had already done everything that he was going to do for Plaintiff's foot. Id.

Plaintiff returned to medical On September 12, 2003, because "my leg and foot were oozing pus so bad that it was drenching my pants leg." Id. at ¶ 5. The leg was swelling and the skin was discolored "dark red/purplest." Id. Dr. Patel again declined to give Plaintiff antibiotics. Id. On September 13, 2003, an officer noticed Plaintiff's leg and took him back to medical. Id. Dr. Patel again said he had done everything he was going to do. Id. The officer then directed another officer to take Plaintiff to the emergency room because he had gangrene in his foot. Id.

"Upon entering the Tuomey Hospital in Sumter, S.C. and seeing the doctor there, the doctor told me that I needed surgery on my foot to try to make the gangrene leak downward in order to save my leg. So Dr. Young took me into surgery and amputated the top part of my foot in order to save my leg." Id. at ¶ 6. Plaintiff alleges that "Dr. Young was mad because [Dr. Patel] had . . . deliberately allowed the infection to advance into gangrene without treating the infected area with antibiotics." Id.

Plaintiff further alleges that when Plaintiff returned to ECI, Dr. Patel smiled when he saw him and said, "'I told you, you was going to lose your leg.'" Id. at ¶ 7. Plaintiff also alleges that Dr. Patel refused to refill the medications that were given to him. Id.

In this Circuit, verified complaints by pro se prisoners are to be considered as affidavits when the allegations contained in complaint are based on personal knowledge. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir.1991). Plaintiff has filed a verified Complaint. Therefore, the undersigned has considered the factual allegations set forth in the verified Complaint in issuing a recommendation in this case. Plaintiff also submits his own affidavit and the affidavits of two other inmates in response to Defendants' Motion for Summary Judgment. In his own affidavit, Plaintiff attests to his history of medical problems and his inability to care for himself as an inmate as he did before he was

incarcerated.  See generally Plaintiff Affidavit.  Plaintiff also describes a previous incident where Dr. Patel failed to properly treat him for an infection in his hand.  Plaintiff Aff. at ¶¶ 5-7.  Inmates Jackie Childers and Ronnie Harrleson both attest to their beliefs that Dr. Patel provided them with inadequate medical treatment, but they do not attest to the allegations set forth in this case.  See generally Childers Affidavit and Harrleson Affidavit.

In support of Defendants' Motion for Summary Judgment, Dr. Patel submits an affidavit in which he documents Plaintiff's history of stasis ulcers on his legs, which is complicated by diabetes and smoking.  Patel Aff. at ¶ 4.  Plaintiff's condition causes "swelling, brown and crackling skin, periodic oozing from open sores and chronic discoloration of the lower extremities."  Id.  According to Dr. Patel, the standard of care for such ulcers ins to clean and bandage the wound when it first appears, elevate the legs while sleeping, and monitor the wound to make sure it heals.  Id. at ¶ 5.  If the ulcers or wounds ever became infected, the standard of care would be to treat the inmate with antibiotics or transport him to the hospital.  Id. at ¶ 8.

Dr. Patel's affidavit and the medical records attached indicate that Plaintiff has been treated for this condition on several occasions while at ECI.  In December of 2001, Plaintiff had right leg pain with swelling, scaling, and crusting.  Id. at ¶ 10; Ex. A.5.  Medical observed him until the wound healed.  Id.  Plaintiff was referred for a peripheral vascular study, which revealed circulation problems due to primary varicose vein disease.  Id. at ¶¶ 10-11; Ex. A.5, A.6.  In February of 2002, Plaintiff complained of a hurting leg with redness and a dark area.  Id. at ¶ 13; Ex. A.4.  He was placed in the infirmary for observation and had dressing changes until the leg healed.  Id.  In July of 2002, Plaintiff again complained of his legs breaking out.  Id. at ¶ 14; Ex. A.4.  Medical observed Plaintiff until his legs healed.  Id.  In August of 2002, Plaintiff complained of a laceration or abrasion

on his leg. Id. at ¶ 15, Ex. A.4. Medical examined the wound, cleaned and bandaged it and followed it until it healed. Id. Plaintiff visited medical several times in June of 2003 with complaints of scaling and swelling of his right lower leg. Id. at ¶ 16; Ex. A.3. Plaintiff had discoloration, drainage and flakiness. Id. It was noted that Plaintiff has a history of poor blood circulation related to his diabetes, and he was followed until the wound healed. Id. He was advised to return to see the doctor if it got worse. Id.

There are notations throughout the medical records from ECI that Plaintiff refuses his insulin, does not comply with treatments or medications and continues to smoke. Ex A.1-A.6.

The medical records from ECI reveal no indication that Plaintiff visited sick call on September 1, 2003, as alleged in his Amended Complaint. Ex. A.3. Plaintiff was a "no show" for sick call on September 2, 2003. Patel Aff. at ¶ 17; Ex. A.3. Plaintiff visited sick call on September 4, 2003, but made no complaints of an injury. Id. Another vascular study was ordered at that time. Id.

On September 8, 2003, Plaintiff visited medical complaining that his foot was run over the previous day by a wheelchair. Id. at 18; Ex. A.3. It was noted that his right leg was dark from midcalf down and there was edema of the foot. Id. He was referred to see Dr. Patel the next day. Id. On September 9, 2003, Dr. Patel ordered x-rays of Plaintiff's foot, which were negative. Id. at ¶ 19; Ex. A.3. At that time, Plaintiff appeared to have a bruise, but there was no sign of an open wound, drainage or infection. Id. On September 10, 2003, Plaintiff returned to medical, complaining of continued leg pain. Id. at ¶ 20; Ex. A.3. There was no sign of infection at that time and it was noted that his appointment for the vascular study was scheduled for September 22, 2003. Id. Plaintiff returned to medical on September 12, 2003, complaining about his leg. Id. at ¶ 21; Ex.

A.3. At that time, it was noted that his leg was swollen and red with open lesions and was hot to the touch, which would indicate possible infection. Id. Due to possible infection and in light of his underlying condition, Dr. Patel referred Plaintiff to Tuomey Hospital the same day. Id. at ¶ 22; Ex. A.3.

The medical records from Tuomey reveal that Plaintiff stated that he was injured when a wheelchair accidentally ran over his right foot on September 7, 2003. Id. at ¶ 23, Ex. B.1. Plaintiff said he developed a lot of redness and pain and swelling in the foot. Id. He developed a lot of draining and some blisters on the foot that day, September 12, 2003. Id. Plaintiff was admitted to the hospital for further evaluation and treatment. Id. During his stay at the hospital, Plaintiff was placed on antibiotics and several abscesses were drained on his right foot and leg. Id. at ¶ 24; Ex. B.1.

Plaintiff was discharged from Tuomey on September 22, 2003, and was sent to the infirmary at Kirkland Correctional Institution (KCI) for follow-up treatment. Id. at ¶ 25; Ex. B.1. A note from KCI records indicates that Plaintiff was scheduled for right below the knee amputation at Tuomey for November 7, 2003, but was later rescheduled for December 16, 2003. Ex. A.3. Plaintiff was discharged from the infirmary at KCI and returned to ECI on November 14, 2003. Id. When he returned to Tuomey on December 16, 2003, it was noted that the non-healing ulcers on his right foot and foreleg were caused by severe venostasis, or varicose vein disease. Patel Aff. at ¶ 27; Ex. B.1. This condition is a stagnation of fluid in the leg, which is exacerbated by his uncontrolled diabetes and smoking. Id. Plaintiff underwent a right below the knee amputation on December 16, 2003, was discharged from Tuomey on December 19, 2003, and was sent to the infirmary at KCI. Ex. B.1. Plaintiff was discharged from the Infirmary at KCI on January 9, 2004, and returned to ECI. Ex. B.1.

**III.    STANDARD OF REVIEW**

A federal court must liberally construe pleadings filed by pro se litigants, to allow them to fully develop potentially meritorious cases. See Cruz v. Beto, 405 U.S. 319 (1972), and Haines v. Kerner, 404 U.S. 519 (1972). In considering a motion for summary judgment, the court's function is not to decide issues of fact, but to decide whether there is an issue of fact to be tried. The requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a federal claim, Weller v. Department of Social Services, 901 F.2d 387 (4th Cir. 1990), nor can the court assume the existence of a genuine issue of material fact where none exists. If none can be shown, the motion should be granted. Fed. R. Civ. P. 56(c). The movant has the burden of proving that a judgment on the pleadings is appropriate. Once the moving party makes this showing, however, the opposing party must respond to the motion with "specific facts showing that there is a genuine issue for trial." The opposing party may not rest on the mere assertions contained in the pleadings. Fed. R. Civ. P. 56(e) and Celotex v. Catrett, 477 U.S. 317 (1986).

The Federal Rules of Civil Procedure encourage the entry of summary judgment where both parties have had ample opportunity to explore the merits of their cases and examination of the case makes it clear that one party has failed to establish the existence of an essential element in the case, on which that party will bear the burden of proof at trial. See Fed. R. Civ. P. 56(c). Where the movant can show a complete failure of proof concerning an essential element of the non-moving party's case, all other facts become immaterial because there can be "no genuine issue of material fact." In the Celotex case, the Court held that defendants were "entitled to judgment as a matter of

law" under Rule 56(c) because the plaintiff failed to make a sufficient showing on essential elements of his case with respect to which he has the burden of proof. <u>Celotex</u>, 477 U.S. at 322-323.

## IV.   DISCUSSION

### A.   Allegations/Arguments of Parties

Plaintiff alleges that Dr. Patel, sued in both his individual and official capacities, was deliberately indifferent to his serious medical needs, is liable for his unethical practice and treatment of Plaintiff, and is liable for deviating from the standard of care. Plaintiff alleges that Defendant Willie Eagleton (Eagleton), Warden of ECI, sued in both his individual and official capacities, is liable and responsible for allowing Dr. Patel to cause him personal injury and damage. Plaintiff does not assert any specific allegations against SCDC. Although not specifically set forth in his Amended Complaint, in light of the nature of Plaintiff's allegations, the undersigned will construe Plaintiff's claims as falling under 42 U.S.C. § 1983 for violation of his Eighth Amendment right to be free from cruel and unusual punishment.

Defendants set forth numerous arguments in response to Plaintiff's allegations: 1) any state law claims must be dismissed on the grounds of res judicata and collateral estoppel; 2) Defendants are not "persons" amenable to suit under 42 U.S.C. § 1983; 3) Defendants are immune from suit pursuant to the Eleventh Amendment; 4) Plaintiff has failed to state a claim against Eagleton under a theory of supervisory liability; 5) Plaintiff has failed to state a claim pursuant to the Fifth or Fourteenth Amendments[1]; 6) Plaintiff has failed to state a cause of action pursuant to the Eighth

---

[1] Plaintiff states generally in his Amended Complaint that his fifth, eighth, and fourteenth amendment rights have been violated. However, Plaintiff sets forth no factual allegations that would fall under the Fifth or Fourteenth Amendments, nor has he asserted how his due process or equal protection rights have been violated. Thus, as noted above, the undersigned will construe Plaintiff's claims asserting violations of his Eighth Amendment right to be free from cruel and

Amendment because he has failed to show deliberate indifference to his serious medical needs; 7) Defendants are entitled to qualified immunity from all liability; and 8) the action should be dismissed under 28 U.S.C. §1915(e) and §1915a, and should count as a strike.

### B.     Res Judicata

Defendants argue, to the extent Plaintiff is asserting any state law claims, those claims should be dismissed based on the doctrine of res judicata, or claim preclusion. Prior to filing the present action, Plaintiff filed a negligence action based on the same set of facts alleged here against Dr. Patel and SCDC in the Marlboro County Court of Common Pleas, Civil Action No. 05-CP-34-0163. See Ex. 1 to Defendants' Motion. In that action, Defendants filed a motion for summary judgment and a hearing was held at which all parties were present. Following the hearing, the court issued an order giving Plaintiff ninety (90) days to file with the court an affidavit from a medical doctor and serve it on Defendants. In an order dated August 31, 2006, the court noted that ninety days had passed and Plaintiff failed to submit the affidavit. The court granted Defendants' motion for summary judgment and dismissed the case with prejudice. See Ex. 2 to Defendants' Motion.

Defendants also appear to argue that the entire action should be dismissed based on the doctrine of collateral estoppel, or issue preclusion, in light of the fact that the state court dismissed Plaintiff's negligence and gross negligence claims and that Plaintiff must establish more than mere negligence to succeed on a § 1983 claim for deliberate indifference. The undersigned agrees, in part, with Defendants. More specifically, the undersigned finds that the entire action as to Defendants Dr.

---

unusual punishment.

Patel and SCDC is barred on the doctrine of res judicata, or claim preclusion, rather than on the doctrine of collateral estoppel, or issue preclusion.[2]

Under the principles of res judicata, or claim preclusion, a prior judgement between the same parties can preclude subsequent litigation between the same parties or of the same issues. Orca Yachts, L.L.C. v. Mollicam, Incorporated, 287 F.3d 316, 318 (4th Cir. 2002)(internal citations omitted). The rules of claim preclusion provide that if the later litigation arises from the same cause of action as the first, then the judgment in the prior action bars litigation "not only of every matter actually adjudicated in the earlier case, but also of every claim that might have been presented." Id.

Claims are barred "when three elements are satisfied: 1) the prior judgement was final and on the merits, and rendered by a court of competent jurisdiction in accordance with the requirements of due process; 2) the parties are identical, or in privity, in the two actions; and 3) the claims in the second matter are based upon the same cause of action involved in the earlier proceeding." Pittston Co., 199 F.3d at 704.

Claim preclusion prohibits relitigation of claims arising "out of the same transaction or series of transactions as the claim resolved by the prior judgment." The Pittston Company v. United States, 199 F.3d 694, 704 (4th Cir. 1999)(internal citations omitted); see also Restatement (Second) of Judgments § 24(1) (claims precluded are those arising out of the same transaction or series of

---

[2]"Issue preclusion is more narrowly drawn and . . . operates to bar subsequent litigation of those legal and factual issues common to both actions that were 'actually and necessarily determined by a court of competent jurisdiction in the first litigation." Orca Yachts, L.L.C., 287 F.3d at 318. Because the state court's order dismissing Plaintiff's case is brief and states only that summary judgment is granted for Plaintiff's failure to submit an affidavit from a medical provider, the undersigned declines to find which particular issues were 'actually and necessarily determined' by that court.

connected transactions, and are precluded even if they constitute separate "causes of action"). "'Transaction' . . . connotes a natural grouping or common nucleus of operative facts." Id. Not only does res judicata bar claims that were actually raised, it "prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding." Brown v. Felsen, 442 U.S. 127, 131, 99 S.Ct. 2205, 2209, 60 L.Ed.2d 767 (1979).

In the present case, the judgment rendered by the state court was final and on the merits, and involved Plaintiff, SCDC and Dr. Patel. Additionally, the claims raised in the state court action arose out of the same transaction or serious of transactions as the claims raised in the present action. Plaintiff's § 1983 claim arises from the same "common nucleus of operative facts" as alleged in Plaintiff's state action. Thus, Plaintiff should have brought any § 1983 claims against Dr. Patel and SCDC arising out of that same "common nucleus of operative facts" in his state court action. His failure to do so bars this subsequent litigation on those claims. As such, all claims against Dr. Patel and SCDC should be dismissed based on the doctrine of res judicata, or claim preclusion.[3] Because Eagleton was not a party to the state court litigation, the claims against him should go forward.

### C.     Eleventh Amendment Immunity/Defendants not "Persons" Amenable to Suit Under § 1983

Eagleton contends that Plaintiff's § 1983 claims against him in his official capacity are barred because while acting in his official capacity as an employee of SCDC he is not a "person" under 42

---

[3]In his Response to Defendants' Motion, Plaintiff argues that he did not receive a copy of the state court order until Defendants attached a copy to their Motion, and requests that this Court conduct a handwriting analysis on the signature of the Honorable John M. Milling, asserting that the Defendants could have forged the signature. The order is stamped filed as of September 5, 2006, and is further stamped by the Marlboro County Clerk of Court as "a certified true copy." The court may take judicial notice of public documents.

U.S.C. § 1983 and, therefore, is not subject to suit. Eagleton also argues that the action against him in his official capacity should be dismissed pursuant to Eleventh Amendment Immunity inasmuch as Plaintiff seeks monetary damages.

When a defendant is sued in his or her official capacity, the suit is frequently intended as one against the state, the real party in interest. If review of the pleadings indicates that the state is, in fact, the party being sued, then a judgment awarding damages is precluded by the Eleventh Amendment of the United States Constitution.

In the case of Will v. Michigan Department of State Police, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), the Supreme Court analyzed the interplay between § 1983 and the Eleventh Amendment of the Constitution and stated:

> Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties. The Eleventh Amendment bars such suits unless the State has waived its immunity . . . or unless Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override that immunity.

Id. at 67 (internal citations omitted).

The Eleventh Amendment immunity granted to the states "applies only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes," but the court found that state agencies, divisions, departments and officials are also entitled to the Eleventh Amendment immunity. Id. at 70. In reaching this conclusion, the court held that a suit against state officials acting in their official capacities is actually against the office itself, and therefore, against the state. Id. at 71. State officials may only be sued in their individual capacities. Id.

There is no dispute that Eagleton, as Warden of ECI, is an employee of SCDC and, thus, is a state official acting in his official capacity while employed by SCDC. Therefore, in his official capacity, Eagleton is entitled to Eleventh Amendment immunity from monetary damages. Plaintiff does not seek any relief other than monetary damages; thus, summary judgment is proper as to Eagleton in his official capacity.

### D.     Plaintiff's Claims against Eagleton

Plaintiff claims that Eagleton is liable and responsible for allowing Dr. Patel to subject him to personal injury and damage, for deliberate indifference to his serious medical needs, and for deviating from the scope and standards of care of a license health care provider. Amended Complaint, Plaintiff Amended Statement of Claim, at ¶¶ 16-18. However, Plaintiff sets forth no factual allegations to suggest that Eagleton was in anyway involved in actually providing him with any medical care. It is undisputed that Eagleton does not have a medical degree, is not personally involved in the medical care of inmates at ECI and relies on the medical staff at ECI to properly care for inmates. Eagleton Aff. at ¶ 4. Thus, it appears that Plaintiff is asserting a claim against Eagleton under the theory of supervisory liability.

In a § 1983 action, a supervisor is not liable for the acts of an employee, absent an official policy or custom which result in illegal action. Monell v. Department of Social Services, 436 U.S. 658, 694 (1978). A medical treatment claim is not appropriate against a supervisor absent an allegation that he was personally connected to the treatment received. Vinnedge v. Gibbs, 550 F.2d 926 (4th Cir.1977). Supervisory liability requires that supervisory officials failed promptly to provide an inmate with needed medical care, deliberately interfered with a prison doctor's

performance, or tacitly authorized or were indifferent to prison physician's constitutional violation. Milter v. Beon, 896 F.2d 848 (4th Cir.1990).

Plaintiff asserts no allegations that Eagleton was personally involved with Plaintiff's treatment or that he deliberately interfered with Dr. Patel's performance. To the extent that Plaintiff alleges that Eagleton tacitly authorized or was deliberately indifferent to any constitutional violations by Dr. Patel, Plaintiff has asserted no allegations that Eagleton was aware of the treatment or lack thereof that Dr. Patel was providing to Plaintiff. Furthermore, Eagleton avers that he "[has] not been made aware of any history of a problem with [Plaintiff] or any other inmate not receiving proper medical care" nor has he "been advised of any problems with the medical care at ECI." Eagleton Aff. at ¶¶ 5,8. Thus, any claim of supervisory liability is without merit and summary judgment is proper as to the claims against Eagleton.

### E.     Qualified Immunity

Eagleton asserts that, even if the court finds that Plaintiff's constitutional rights were violated, he is entitled to qualified immunity as he was acting reasonably within the course of his employment and did not violate any clearly established laws. As established above, the undersigned recommends that the district judge find that Eagleton did not violate Plaintiff's constitutional rights. However, in the event the district judge declines to adopt this recommendation, it is recommended that Eagleton be entitled to qualified immunity.

The Supreme Court in Harlow v. Fitzgerald, 457 U.S. 800 (1982), established the standard which the court is to follow in determining whether a defendant is protected by qualified immunity. The Court in Harlow held that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known.

Harlow, 457 U.S. at 818.

In a discussion of qualified immunity, the Court of Appeals for the Fourth Circuit stated:

> Qualified immunity shields a governmental official from liability for civil monetary damages if the officer's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. In determining whether the specific right allegedly violated was 'clearly established,' the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged. Moreover, the manner in which this [clearly established] right applies to the actions of the official must also be apparent. As such, if there is a "legitimate question" as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity.

Wiley v. Doory, 14 F. 3d 993, 995 (4th Cir. 1994) (internal citations omitted), cert. denied, 516 U.S. 824 (1985).

In Torchinsky v. Siwinski, 942 F. 2d 257 (4th Cir.1991), the Fourth Circuit Court of Appeals explained the rationale for Harlow qualified immunity:

> The grant of qualified immunity to government officials ensures that these officials can perform their duties free from the specter of endless and debilitating lawsuits. Without such immunity, the operations of government would be immobilized. Permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.

Torchinsky, 942 F.2d at 260-261. (Citations Omitted).

The Torchinsky court further noted that "a particularly appropriate procedure for determining an official's entitlement to qualified immunity is summary judgment." Id. at 261. The Torchinsky court held that an official's entitlement to qualified immunity is based upon an "objective reasonableness" standard. Id. "The very idea of reasonableness requires that courts accord interpretive latitude to officials judgments." Id. (citing Sevigny v. Dicksey, 846 F. 2d 953 (4th

Cir.1988)). Therefore, a plaintiff may prove that his rights have been violated, but the official is still entitled to qualified immunity if a reasonable person in the "official's position could have failed to appreciate that his conduct would violate" those rights. Id. (citing Collinson v. Gott, 895 F. 2d 994 (4th Cir. 1990)). As the Fourth Circuit explained in the case of Swanson v. Powers, 937 F. 2d 965 (4th Cir.1991), "[o]nly violations of those federal rights clearly recognized in existing case law will support an award in damages under 42 U.S.C. § 1983." Id. at 967. Therefore, if a particular action by a state agency is deemed unconstitutional, the defendant is entitled to qualified immunity unless there is clearly established case law demonstrating that the alleged conduct is violative of the Constitution.

In Maciariello v. Sumner, 973 F. 2d 295 (4th Cir. 1992), the Fourth Circuit Court of Appeals further explained the theory of qualified immunity when it set forth that:

> Governmental officials performing discretionary functions are shielded from liability for money damages so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Moreover, there are two levels at which the immunity shield operates. First, the particular right must be clearly established in the law. Second, the manner in which this right applies to the actions of the official must also be apparent. Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.

Maciariello, 973 F. 2d at 298 (citations omitted).

For a plaintiff to recover, he must show the defendants (i) violated a particular right clearly established in law, and (ii) the application of that right to the actions of the official must be apparent. Plaintiff in this case has not done so. It is undisputed that Eagleton was unaware of the nature of Plaintiff's medical treatment. Thus, to the extent he violated Plaintiff's constitutional rights in some way, it is reasonable that he would fail to realize that his actions violated Plaintiff's rights. The

undersigned cannot conclude that Eagleton "transgressed bright lines." Id.   Therefore, summary judgment is proper on the basis of qualified immunity as well.

## V.     CONCLUSION

For the reasons set forth above, it is recommended that Defendants' Motion for Summary Judgment (Document # 17) be granted, and that this case be dismissed in its entirety.

 s/Thomas E. Rogers, III  
Thomas E. Rogers, III  
United States Magistrate Judge

August 2, 2007  
Florence, South Carolina

**The parties' attention is directed to the important notice on the next page.**